UNITED STATES of America,
Appellant/Cross–Appellee,

v.

Archibald R. SCHAFFER, III,
Appellee/Cross–Appellant.

Nos. 98–3123, 98–3126.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 12, 1999.

Decided July 23, 1999.

As Amended Sept. 10, 1999.

Robert W. Ray, Deputy Independent Counsel, argued the cause for appellant/cross-appellee. With him on the briefs were Donald C. Smaltz, Independent Counsel, Charles M. Kagay, Chief Appellate Counsel, Wil Frentzen, Adrienne R. Baron and Joseph P. Guichet, Associate Independent Counsel.

William H. Jeffress, Jr., argued the cause for appellee/cross-appellant. With him on the briefs were Joe R. Caldwell, Jr., James R. Heavner, Jr., Grant R. Vinik and Woody Bassett.

Before: WALD, SILBERMAN and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

Opinion concurring in part and dissenting in part filed by Circuit Judge HENDERSON.

WALD, Circuit Judge:

The United States appeals a decision by the district court granting Archibald Schaffer's post-trial motion for a judgment of acquittal. After a jury found Schaffer guilty of violating the Meat Inspection Act, 21 U.S.C. § 622, and the federal gratuity statute, 18 U.S.C. § 201(c)(1)(A), the court set aside the verdict on the grounds that the jury had been presented insufficient evidence to support a verdict of guilt on either count. *See United States v.*

*Williams*, 29 F.Supp.2d 1 (D.D.C.1998). Subsequently, the court conditionally denied Schaffer's motion for a new trial, a decision from which Schaffer has filed a conditional cross-appeal. While we agree with the district court's determination that the evidence cannot support a conviction for giving an unlawful gratuity, we find sufficient evidence in the record from which a reasonable juror could have concluded that Schaffer violated the Meat Inspection Act. Therefore, we affirm the district court's decision in part and reverse in part. We additionally reject the challenges raised in Schaffer's conditional cross-appeal. Accordingly, we vacate the judgment of acquittal on the Meat Inspection Act count, reinstate the jury verdict on that count, and remand for sentencing.

## I. BACKGROUND

The evidentiary disputes in these appeals must be evaluated in their surrounding context, a much-publicized backdrop that contains more than a hint of Washington theater. Because consideration of whether the jury verdict has sufficient evidentiary underpinnings is necessarily fact-intensive, we set out the relevant incidents in some detail. The criminal charges brought against Archibald Schaffer ("Schaffer" or the "defendant") trace back to 1994, when allegations of illegality were first levied against then-Secretary of Agriculture Alphonso Michael Espy ("Secretary Espy," "Espy," or the "Secretary"). On application of the Attorney General, a special division of this circuit appointed Donald C. Smaltz as independent counsel and granted him the authority to investigate whether Secretary Espy had violated federal criminal law by accepting gifts from individuals or corporations with business before, or regulated by, the United States Department of Agriculture ("USDA"). *See In re Espy*, 145 F.3d 1365 (D.C.Cir. Spec. Div.1998). Along with some other regulated entities, Tyson Foods International ("Tyson Foods"), the world's largest producer of poultry products, ultimately came under official scrutiny for its generosity towards Secretary Espy. Schaffer, then the Director of Media, Public and Governmental Affairs for Tyson Foods, became a target in this investigation for his alleged role in transmitting things of value from his employer to the Secretary.

The independent counsel's inquiry into the relationship between Tyson Foods and Secretary Espy focused upon a chain of events that date back to the transition period preceding William Jefferson Clinton's inauguration as President. In December of 1992, at a meeting requested by then Congressman Espy with Don Tyson and John Tyson, respectively the Chairman of the Board and the President of the Beef and Pork Division at Tyson Foods, the Congressman communicated his desire and his qualifications to become the Secretary of Agriculture. He was subsequently nominated to that position on December 24, 1992, and sworn in on January 22, 1993, taking office in the midst of a major public health crisis. An outbreak of *E coli* 0157:H7 ("*E coli*") in the Pacific Northwest, apparently stemming from undercooked hamburger meat, had caused the death of three children and generated illness in six hundred other individuals. Since the Department of Agriculture has ultimate statutory responsibility for the integrity of the nation's food supply, including authority to regulate both the poultry and the meat industry, the *E coli* outbreak was a matter of major importance within the Department.

In response to the public concern, Secretary Espy and the USDA announced a series of initiatives and new regulations designed to enhance food safety. These policies were directed at preventing contamination and instructing the public as to the proper handling procedures for meat and poultry. Along with other affected companies, Schaffer participated in lobbying the Secretary on behalf of Tyson Foods, and in disseminating the company's views with respect to pending and ongoing regulatory matters. During this same period of time, Schaffer, on behalf of Tyson Foods, participated in providing items of value to Secretary Espy. According to the

indictment, Schaffer provided these gratuities in an attempt to influence the Secretary's actions with respect to matters of interest to Tyson Foods then pending before the USDA.

The indictment alleges a pattern of gift-giving which predates Espy's official elevation to the position of Agriculture Secretary and continues through January of 1994. Through Schaffer and others, Tyson Foods provided the following things of value to Secretary Espy and those closely affiliated with him: (1) In early January of 1993, Tyson Foods hosted Espy, his girlfriend Patricia Dempsey ("Dempsey"), and two of Espy's siblings at the $1,500 per person inaugural dinner at the Washington Sheraton Hotel, providing each a seat at one of the three Tyson Foods' tables purchased for the evening. (2) In April of 1993, Don Tyson invited Secretary Espy and Dempsey to a weekend-long birthday party at the Tyson Foods Management Training Complex ("Tyson Complex") in Russellville, Arkansas (the "Russellville party"). When Espy accepted the invitation, Schaffer arranged for their transportation on a Tyson Foods corporate jet.[1] Secretary Espy attended the party with Dempsey, at which they were entertained by B.B. King and other musicians, and then spent the night at the Tyson Complex. (3) In September of 1993, John Tyson advised Dempsey of, and recommended that she apply for scholarship money available from the Tyson Foundation. Dempsey ultimately received a $1,200 Foundation scholarship. (4) On January 16, 1994, Secretary Espy and Dempsey attended the Dallas Cowboys–Green Bay Packers playoff game as guests of Don Tyson. Tyson Foods purchased Dempsey's plane ticket, arranged car and limousine transportation for Espy and Dempsey, and provided seats in the Tyson Foods skybox.[2]

During the gift-giving period, USDA officials were at various stages in the process of developing and implementing initiatives that would seriously impact the business of Tyson Foods. On February 3, 1993, while accompanying the Secretary on a fact-finding mission to the area affected by the E coli outbreak, Dr. Russell Cross ("Dr. Cross"), the Administrator of USDA's Food Safety and Inspection Service ("FSIS"), outlined to an enthusiastic Secretary Espy a series of policies designed to enhance the safety of meat and poultry products on which FSIS had been working. The Secretary announced his intention to move forward along the lines of Dr. Cross's policy proposals at a meeting with industry representatives the following day. On February 5, 1993, Dr. Cross made a similar presentation before a Senate subcommittee, announcing a series of initiatives intended to prevent further outbreaks of food poisoning. Dr. Cross outlined a "Two–Track" approach to eliminating the presence of pathogens in meat and poultry products. Track 1, aimed at maximizing the performance of then-existing inspection methods, involved the implementation of six initiatives. Included among the six, FSIS proposed to enhance its detection and control measures, to develop quantitative risk analysis, to encourage the use of technologies that reduce pathogens, and to increase consumer awareness of safe food practices through disseminating information on how best to handle meat and poultry products. Track 2, which at that stage was more amorphous than Track 1, called for a revolutionary redesign of safety programs.

Throughout 1993, the USDA continued work on two of the Track 1 policies of great interest to Tyson Foods. First, FSIS refined and implemented a plan for pathogen reduction, an effort which even-

---

1. While Dempsey flew from Washington to Russellville on the Tyson Foods jet, Secretary Espy came separately from Mississippi, where he had delivered two commencement addresses. Both Secretary Espy and Dempsey returned to Washington on the company jet.

2. Although Schaffer did not participate in providing the last two things of value, the jury heard this evidence of Tyson Foods' total largess as part of the case against Jack Williams, a lobbyist for Tyson Foods and Schaffer's co-defendant.

tually acquired the name "zero tolerance."[3] Although its attention initially focused upon meat, the improper handling of which had generated the *E coli* outbreak, FSIS was also in the process of formulating a "zero tolerance" pathogen control program for poultry. Second, FSIS worked on developing a consumer education program that would apply to all meat and poultry products. This effort culminated in an emergency regulation mandating the use of so-called "safe handling labels" on all not-ready-to-eat products. Intended to heighten consumer awareness, these labels would contain care and handling instructions designed to eliminate the risk posed by food-borne pathogens. Announced by Secretary Espy on August 11, 1993, and officially promulgated five days later, this emergency interim rule required that USDA-approved labels be in place within sixty days. After an intense industry lobbying campaign coupled with White House intervention, Secretary Espy ultimately agreed to delay implementation of the emergency regulation, pushing the date for full compliance back to April 15, 1994.

In response to the independent counsel's investigation into this concatenation of events, a federal grand jury in the District of Columbia indicted Schaffer on seven separate counts of a fifteen count indictment on January 15, 1998. Together with co-defendant Jack Williams, a lobbyist for Tyson Foods, the indictment charged Schaffer with conspiracy to defraud the United States of the honest services of Secretary Espy, in violation of 18 U.S.C. § 371; Schaffer was also charged with two counts of wire fraud, in violation of 18 U.S.C. §§ 1343, 1346; two counts of providing unlawful gratuities, in violation of 18 U.S.C. § 201(c)(1)(A); and one count of violating the Meat Inspection Act, 21 U.S.C. § 622 (the "Act"). The indictment additionally alleged that Schaffer had committed mail fraud, in violation of 18 U.S.C. §§ 1341, 1346.[4] The district court dismissed four of the seven counts at the close of the prosecution's case-in-chief. Following completion of an eight-day trial, the five remaining counts against Schaffer—one under the Meat Inspection Act and two for providing unlawful gratuities—were submitted to the jury. Schaffer was found guilty on two of these counts, first for violating the Meat Inspection Act[5] in conjunction with Secretary Espy's attendance at the Russellville party, and second for violating the federal gratuity statute[6] through providing tickets to the inaugural dinner.

3. The policy apparently acquired this nickname from a March 2, 1993 memorandum that the Deputy Administrator of FSIS sent to cattle slaughter establishments, requiring them to trim off any beef contaminated with fecal matter. With respect to such contamination, the directive concluded, "our policy will be zero." *See* 6/17/98 Transcript ("Tr.") at 433–34.

4. Jack Williams was also charged with two counts of making false statements to federal agents in violation of 18 U.S.C. § 1001, and found guilty on each. Because Williams has withdrawn his appeal from the district court's decision denying his acquittal and new trial motions, our discussion focuses on Schaffer alone. We mention Williams solely to provide a complete and accurate portrait of the proceedings before the district court.

5. 21 U.S.C. § 622 provides:

Any person, firm, or corporation, or any agent or employee of any person, firm, or corporation, who shall give, pay or offer, directly or indirectly, to any ... officer or employee of the United States authorized to perform any of the duties prescribed by this subchapter or by the rules and regulations of the Secretary any money or other thing of value, with intent to influence said ... officer or employee of the United States in the discharge of any duty provided for in this subchapter, shall be deemed guilty of a felony, and, upon conviction thereof, shall be punished by a fine not less than $5,000 nor more than $10,000 and by imprisonment not less than one year nor more than three years.

6. 18 U.S.C. § 201(c)(1)(A) provides that anyone who

otherwise than is provided by law for the proper discharge of official duty ... directly or indirectly gives, offers, or promises anything of value to any public official, former public official, or person selected to be a public official, for or because of any official act performed or to be performed by

Upon the defendant's subsequent Rule 29 motion for a judgment of acquittal, the district court set aside the jury's verdict on both counts. Acknowledging that the jury had heard sufficient evidence to support an inference that Schaffer had either given, or aided and abetted the giving of things of value to Secretary Espy, an essential element under each of the criminal statutes, the court nevertheless concluded that no rational trier of fact could have concluded that Schaffer had acted with the requisite intent to influence on either occasion. *See United States v. Williams*, 29 F.Supp.2d at 6.[7] Using this court's decision in *United States v. Sun–Diamond Growers of California*, 138 F.3d 961 (D.C.Cir.1998) ("*Sun–Diamond I*"), *aff'd*, —— U.S. ——, 119 S.Ct. 1402, 143 L.Ed.2d 576 (1999) ("*Sun–Diamond*"), as its point of departure, the court read both the federal gratuity statute and the Meat Inspection Act as requiring a link between the gifts and an intent to influence specific official acts of the recipient. Since the trial and the jury instructions had each revolved around two official USDA policies—*i.e.* zero tolerance and safe handling labels—the court examined the nexus between those policies and the gifts given to Espy to determine if it was strong enough to sustain a finding of intent to influence an official act (under the gratuity statute) or the discharge of any duty (under the Meat Inspection Act). Beginning with the gratuities count, the court asserted that "[t]here was no evidence that Mr. Schaffer or anybody in Tyson Foods knew or anticipated anything about zero tolerance or mandatory safe handling labels at the time of the inaugural dinner," *Williams*, 29 F.Supp.2d at 7, because *E coli* had first been identified as the cause of the deadly food poisoning outbreak only earlier that day. As for the Meat Inspection Act count, the court similarly concluded that neither of the two policies could provide the requisite nexus with the Russellville party; each was disqualified for temporal reasons. In the court's view, zero tolerance had ceased to be a live issue for meat more than two months before the weekend gala, and Tyson Foods had yet to voice any objection to the regulation mandating safe handling labels. *See id.* at 7–8. Accordingly, the court granted Schaffer's Rule 29 motion and entered a judgment of acquittal on each count. Seeking reinstatement of the jury verdict, the independent counsel appeals from this decision on behalf of the United States.

## II. DISCUSSION

In reviewing a post-verdict judgment of acquittal, this court undertakes an examination identical to that made by the trial judge in passing upon the defendant's motion. We examine the evidence in the light most favorable to the government, and draw all reasonable inferences in its favor. *See United States v. Singleton*, 702 F.2d 1159, 1163 (D.C.Cir.1983). While we recognize the district court's unique vantage point in evaluating the evidence, our review is nevertheless *de novo*. *See United States v. Campbell*, 702 F.2d 1182, 1183 (D.C.Cir.1983) (in banc). Finally, in order to safeguard the factfinding function assigned to the jury, we make a searching

, such public official, former public official, or person selected to be a public official ... shall be fined under this title or imprisoned for not more than two years, or both.

The statute further defines an "official act" to include "any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity...." 18 U.S.C. § 201(a)(3).

7. The court conditionally disposed of Schaffer's new trial motion in a separate and subsequent order. *See United States v. Williams*, No. 96–0314 (D. D.C. Oct. 6, 1998) (order denying new trial motion). Schaffer had argued that the court erred in precluding him from eliciting the fact of John and Don Tyson's immunity agreements during the cross-examination of John Tyson, and that the prosecution had made improper and prejudicial comments in each of its opening, closing, and rebuttal statements. The court referenced an earlier trial ruling and its *Williams* opinion as the respective grounds for rejecting each of these contentions. *See* discussion *infra* pp. 850–53.

review of the record to determine whether the prosecution presented evidence from which a rational juror could have found guilt beyond a reasonable doubt. Unless we conclude that no reasonable jury could have found guilt beyond a reasonable doubt on the evidence presented, we defer to its determinations.

### A. The Government's Appeal

#### 1. The Gratuity Statute and the Inaugural Dinner

■ Our assessment of a guilty verdict's evidentiary underpinnings necessarily begins with the language of the statute purportedly contravened, and the essential elements of the crime proscribed therein. The federal gratuity statute makes it unlawful for anyone, directly or indirectly, to

give[ ], offer[ ], or promise[ ] anything of value to any public official, former public official, or person selected to be a public official, *for or because of any official act performed or to be performed* by such public official, former public official, or person selected to be a public official. . . .

18 U.S.C. § 201(c)(1)(A) (emphasis added). As the trial court correctly instructed, a violation of this statute requires the presence of three separate elements: that the defendant (i) knowingly gave a thing of value; (ii) to a public official or person selected to be a public official; (iii) for or because of any official act performed or to be performed. Since the trial court based its decision vacating the gratuities conviction upon the third element, properly conceding that the jury had been presented with sufficient evidence of the first two elements, *see Williams*, 29 F.Supp.2d at 6, we focus our attention there as well.

· Before analyzing the evidence, however, it is necessary to discuss a key question of statutory interpretation that lies at the heart of this case. As both parties readily admit, the statutory language at issue, that a thing of value be given "for or because of an official act," requires some nexus between the thing given and an "official act," which the statute defines as "any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity. . . ." 18 U.S.C. § 201(a)(3). Though this case was tried before the Supreme Court handed down its recent *Sun–Diamond* decision, the proceedings were fully in accord with the Court's subsequent holding that "the giving of gifts by reason of the recipient's mere tenure in office" does not constitute a violation of the gratuity statute. —— U.S. at ——, 119 S.Ct. at 1408. In the words of the district court's jury instructions, "[i]t is not a crime to give things of value to a public official merely to get cozy or in the hopes of inducing warm feelings toward the giver or the giver's employer." 6/25/98 Tr. at 1779. But while all involved agree that the gratuity statute's scienter requirement demands more than a gift motivated solely by the recipient's official status, and that the statutory terms are "pregnant with the requirement that some particular official act be identified and proved," *Sun–Diamond*, —— U.S. at ——, 119 S.Ct. at 1407, the magnitude of the necessary link, and its proper translation into a concrete rule of decision, remains in some doubt.

Although the Supreme Court provided a preliminary exposition of the federal gratuity statute in *Sun–Diamond*, the Court faced a narrow question and provided an equally circumscribed answer. Arising out of the same investigation of Secretary Espy as the present case, the independent counsel had there charged an agricultural trade organization with providing unlawful gratuities to the Secretary. Although the indictment discussed two separate policy matters pending before the Secretary during the gift-giving period, it did not allege any direct connection between the gifts and those (or any other) particular matters of concern to Sun–Diamond. The defendant appealed his ultimate conviction on the grounds that the district court had improperly charged the jury, as the court's instructions only required the jury to find that Espy's official position motivated the

gift. The Supreme Court rejected this reading of the gratuity statute as contrary to the language of its text, *see id.*, its place within the larger statutory and regulatory framework governing the integrity of public officials, and congressional intent. *See id.* at 1408–09. In the Court's view, the operative "for or because of" language naturally means "for or because of some *particular* official act of whatever identity," *id.* at 1407 (emphasis added), and requires the government to "prove a link between a thing of value conferred upon a public official and a specific 'official act' for or because of which it was given." *Id.* at 1411. Since Sun–Diamond might have been convicted for gifts that lacked any nexus with a particular official act but were instead motivated by the Secretary's mere status, the Court felt no need to explore the degree of proof necessary to show the link or how the government might go about establishing its presence.

Given the lack of specific guidance from the Court on the amount and kind of evidence necessary to establish a nexus with an official act,[8] we look to the statute itself. The pertinent language resides within a larger provision, 18 U.S.C. § 201, that proscribes the giving and the receipt of both bribes[9] and illegal gratuities. As we recognized in *United States v. Campbell*, 684 F.2d 141, 149 (D.C.Cir.1982), "[i]t is no easy task to articulate the requisite intent necessary to constitute accepting or giving an illegal gratuity." Because, however, the bribery section has received judicial elaboration and the gratuity provision has not, the former provides an illuminating backdrop against which to begin our interpretive task. The two prohibitions differ in two fundamental respects. First, bribery requires a *quid pro quo*, and accordingly can be seen as having a two-way nexus. That is, bribery typically involves an intent to affect the future actions of a public official through giving something of value, and receipt of that thing of value then motivates the official act. *See Sun–Diamond I*, 138 F.3d at 966. A gratuity, by contrast, requires only a one-way nexus; "the gratuity guideline presumes a situation in which the offender gives the gift without attaching any strings...." *United States v. Mariano*, 983 F.2d 1150, 1159 (1st Cir.1993). *See also United States v. Brewster*, 506 F.2d 62, 72 (D.C.Cir.1974) ("the briber is the mover or producer of the official act, but the official act for which the gratuity is given might have been done without the gratuity, although the gratuity was produced because of the official act").

The two provisions additionally differ in their temporal focus. Bribery is entirely future-oriented, while gratuities can be either forward or backward looking. *See Campbell*, 684 F.2d at 148. In other words, whereas bribery involves the present giving, promise, or demand of something in return for some action in the future, an unlawful gratuity can take one of three forms. First, a gratuity can take the form of a reward for past action—*i.e.*

---

8. The specific interpretive methods used by the *Sun–Diamond* Court to arrive at its conclusion similarly do not help us in this second-level inquiry. Neither elementary linguistic analysis, the structure of the gratuity statute or its place within the larger statutory and administrative fabric regulating gifts to officeholders, nor the desire to avoid trapping the unwary point towards any specific interpretation of the degree of proof necessary to satisfy the Court's "for or because of a particular official act" language.

9. 18 U.S.C. § 201(b)(1) provides in relevant part that whoever

directly or indirectly, corruptly gives, offers or promises anything of value to any public official or person who has been selected to be a public official, or offers or promises any public official ... to give anything of value to any other person or entity, with intent ... to influence any official act ...

has committed bribery; while 18 U.S.C. § 201(b)(2) provides in relevant part that whoever

being a public official or person selected to be a public official, directly or indirectly, corruptly demands, seeks, receives, accepts, or agrees to receive or accept anything of value personally or for any other person or entity, in return for ... being influenced in the performance of any official act ...

has committed bribery.

for a performed official act. *See, e.g., id.* at 148–50 (illegal gratuity where construction company moved the household goods of a judge who had suspended hundreds of its traffic tickets). Second, a gratuity can be intended to entice a public official who has already staked out a position favorable to the giver to maintain that position. *See Sun–Diamond,* —— U.S. at ——, 119 S.Ct. at 1408 (postulating scenario of gift to Department of Justice antitrust appointee who had publicly indicated support of the giving company's pending merger because of anticipated continued future support). Finally, a gratuity can be given with the intent to induce a public official to propose, take, or shy away from some future official act. *See, e.g., United States v. Sawyer,* 85 F.3d 713 (1st Cir.1996) (gifts to legislators who had ability to affect company's ongoing legislative concerns constitute unlawful gratuities under analogously worded Massachusetts statute). This third category would additionally encompass gifts given in the hope that, when the particular official actions move to the forefront, the public official will listen hard to, and hopefully be swayed by, the giver's proposals, suggestions, and/or concerns.

■ The tickets to the inaugural dinner, which form the basis of Schaffer's gratuity conviction, fall into the third variety. Two latent official actions of interest to Tyson Foods—*i.e.,* zero tolerance and safe handling labels—having clearly been established, the sufficiency of the evidence question concerning their nexus with the gratuity is two-fold. First, we assess whether a rational trier of fact could conclude that Schaffer either provided or knowingly aided and abetted Tyson Foods in the provision of the inaugural tickets to Secretary Espy.[10] If the evidence supports such a finding, we then ask whether a rational jury could additionally have determined that the thing of value was provided with the requisite statutory intent to influence Secretary Espy in his actions with regard to those policies. Beginning with the first question, we think it abundantly clear that the evidence presented satisfies the burden of sufficiency. The government introduced a series of internal Tyson Foods documents relating to the inaugural dinner, including: (i) two separate check requisitions to cover the cost of Tyson Foods' tables, each filled out and signed by Schaffer, *see* 6/17/98 Tr. at 392–93; (ii) a memo from Schaffer to the Tyson inaugural team listing table assignments for the dinner, including those of Espy, his girlfriend, and his two siblings, *see* GX87; and (iii) a letter from the presidential inaugural regarding procedures for the event, including the need for tickets, next to which Schaffer had written that he would pick up and distribute them. *See* GX36; 6/24/Tr. at 1595–95. In addition, the government elicited testimony that Schaffer had been involved in coordinating Tyson Foods' participation at various inaugural events. *See* 6/19/98 Tr. at 913. While the

---

**10.** Since the district court instructed the jurors that they could find Schaffer guilty for aiding and abetting either of the counts charged, we use the phrase "knowingly aided and abetted the provision of" as a shorthand for the full set of instructions that follow.

[ ] You may find the defendants or either of them guilty of the Meat Inspection Act and gratuities counts charged without finding that they personally committed each of the acts that made up the crime or that they were present while the crime was being committed.

Any person who in some way intentionally participates in the commission of a crime aids and abets the principle offender....

To find that a defendant aided and abetted in committing a crime, you must find that the defendant knowingly associated himself with the persons who committed the crime, that he participated in the crime as something he wished to bring about, and that he intended by his actions to make the crime succeed.

Now, some affirmative conduct by the defendant to help in planning or carrying out the crime is necessary.... It is sufficient if you find beyond a reasonable doubt that the crime was committed by someone and that the defendant in question knowingly and intentionally aided and abetted the principal offenders in committing the crime.

6/25/98 Tr. at 1780–81.

defense sought to minimize Schaffer's role, the government's testimony, taken as a whole, supports a conclusion that Schaffer participated in providing the four inaugural tickets to Secretary Espy.

The core dispute on the evidentiary sufficiency of the nexus, however, cannot be disposed of as easily. Because of its subjective focus on the motivation behind Tyson Foods' largess, it necessitates a more extensive discussion. In assessing the sufficiency of the evidence presented as to whether Schaffer acted with the requisite intent to influence a particular official act, we begin with the recognition that any attempt to reduce the gratuity statute's nebulous "for or because of" language into a more concrete formulation will necessarily be imperfect. When faced with competing explanations for some specific conduct, conduct which could be either innocuous or illicit depending upon the particular motivation involved, the inquiry will rarely be clean or neat. Both common sense and practical experience, each of which we ascribe to the jury, instruct that human beings rarely act for a single purpose alone. Rather, activity is more typically multi-causal, and directed towards achieving several rather than a single end[s]. Accordingly, we do not view the question of intent in the Manichean terms of the prosecution and the defense, focusing instead upon the more realistic and probative question of whether the acts in question were substantially, or in large part motivated by the requisite intent to influence the Secretary. As a final caveat, we note that as with most cases in which the defendant's state of mind is at issue, it may be near impossible to establish the requisite *mens rea* through direct evidence. In the absence of any specific statement or other contemporaneous documentation of the defendant's subjective motivation, the trier of fact can do no more

than ascribe an intent on the basis of the circumstances surrounding the defendant's actions. *See, e.g., United States v. Woodward,* 149 F.3d 46, 57 (1st Cir.1998) (in assessing whether defendant sought to influence official acts, "[t]he jury was entitled to infer the defendant's intent from the circumstances surrounding his actions, from indirect, as opposed to direct, evidence") (citation omitted); *Chedick v. Nash,* 151 F.3d 1077, 1083 (D.C.Cir.1998) (despite absence of smoking gun, jury entitled to infer intent to defraud from circumstantial evidence); *United States v. Castellanos,* 731 F.2d 979, 984 (D.C.Cir.1984) ("no legal distinction is made between circumstantial and direct evidence in determining whether sufficient evidence supports the verdict").

After an extensive examination of the circumstances surrounding the provision of the inaugural tickets, we cannot say that the trier of fact could reasonably have found the requisite intent to influence beyond a reasonable doubt. The evidence presented was far too meager to support such a conclusion. In support of its argument to the contrary, the independent counsel points to the following trial testimony: (i) as a regulated entity, Tyson Foods routinely had matters of interest before the USDA; (ii) by 1992, FSIS had begun developing new safety measures, including zero tolerance and safe handling labels; (iii) a senior scientist at Tyson Foods, Dr. Ellis Brunton, knew that the USDA had been developing new pathogen control policies prior to the *E coli* outbreak; (iv) Dr. Brunton generally kept Schaffer abreast of pending regulatory developments that could impact Tyson Foods; and (v) the *E coli* outbreak heightened USDA's interest in both zero tolerance and safe handling labels, resulting in the announcement of new policies with respect to each.[11] Accordingly, although the

---

11. At oral argument, the independent counsel additionally referenced the *Texas Food Industry Assoc. v. USDA* opinion, 842 F.Supp. 254, 256 (W.D. Tex.1993), wherein the district court had enjoined enforcement of the safe handling labels emergency interim regulation for failing to satisfy the good cause exception to the Administrative Procedure Act's notice and comment requirement. *See* 5 U.S.C. § 553(b). This decision had been introduced into evidence during Jack Williams's defense, and his counsel had read a portion of it to the

record does not entirely support the district court's conclusion that "[t]here was no evidence that Mr. Schaffer or anybody in Tyson Foods knew or anticipated anything about zero tolerance or safe handling labels at the time of the inaugural dinner," *Williams*, 29 F.Supp.2d at 7, it still cannot support the guilty verdict. Acknowledging the evidence highlighted by the independent counsel, we also note the following undisputed testimony. First, Tyson Foods had purchased its three tables to the dinner before December 24, 1992, the date on which President Clinton announced Espy's appointment to the position of Agriculture Secretary. Second, Espy's name, as well as those of his girlfriend and siblings, appears on a January 15, 1993 memorandum drafted by Schaffer that lists the final table assignments for the inaugural dinner. *See* GX87. Since the *E coli* outbreak occurred sometime in the middle of January, and the USDA did not become apprised of its actual cause—contaminated hamburger meat—until January 18th, the day of the inaugural dinner, USDA's subsequent heightened interest in zero tolerance and safe handling labels could not have motivated the invitation extended to Espy, which necessarily predated January 15th. It was not until February 4th that Secretary Espy briefed industry representatives on his proposed initiatives.

Once the *E coli* outbreak is out of the picture, all that remains is an awareness by a regulated entity that the USDA had been developing a new pathogen control policy.[12] In our opinion, the inferential leap across the chasm separating this premise from the requisite conclusion— that the tickets were intended, beyond a reasonable doubt, to induce Espy to propose, take, or shy away from some action on zero tolerance, or alternatively to ensure that Tyson Foods' proposals, suggestions and/or concerns were accorded special scrutiny—cannot be considered reasonable. The breadth of the Supreme Court's *Sun–Diamond* opinion with respect to identifying a *particular* official act must of necessity spill over here, creating the need for a more definitive link than the prosecution provided. To hold otherwise would mean that any time a regulated entity became aware of any inchoate government proposal that could affect its interests, and subsequently provided something of value to a relevant official, it could be held to violate the gratuity statute in the event that the inchoate proposal later appeared in a more concretized form. Were the inferential leap from this scenario to an intent to influence considered reasonable, we would in effect revive the status-based reading of the gratuity statute the Court so

jury. *See* 6/24/98 Tr. at 1573–74. In a separate part of that opinion, the court quotes from the "Background" and "New Policy Direction" sections of the USDA's interim rule published in the Federal Register. *See* 58 Fed.Reg. 43,478 (August 16, 1993). There, the USDA noted that "[a]gency official [sic] in early January began to advocate in their speeches and writings that mandatory safe handling instructions on the labeling of meat and poultry products was a necessary component of a program to combat foodborne illness." *Id.* at 43,481, quoted in *Texas Food Industry*, 842 F.Supp. at 258. From this passage, completely unrelated to the language for which the opinion had been introduced on Williams's behalf, the independent counsel alleges that the jury could infer that Schaffer and Tyson Foods were aware of the USDA's intent to act on this issue at the time of the inaugural dinner. While we are skeptical of the independent counsel's assertion that the

jury considered this non-highlighted language in assessing the case against Schaffer, even assuming that it did, the language does not support the proposition for which the independent counsel cites it. Simply put, the vague temporal reference to "agency official[s]" advocating mandatory safe handling instructions in "early January" is not sufficient to establish that the USDA had in fact officially initiated a program of promoting safe handling labels, let alone that Tyson Foods had been privy to the relevant writings or speeches, before the time when Tyson Foods offered the inaugural tickets to Secretary Espy.

12. The jury was not presented any evidence that Schaffer, as opposed to Tyson Foods, was actually aware of the anticontamination or safe handling initiatives prior to the February 4th meeting with Secretary Espy.

roundly rejected in *Sun–Diamond*. We balk at any such end run.

### 2. *The Meat Inspection Act and the Russellville Birthday Party*

Schaffer was additionally found guilty of violating the anticorruption provision of the Meat Inspection Act in connection with his role in securing the attendance of Secretary Espy and his girlfriend at Don Tyson's May 1993 Russellville party. Once again, our assessment of the verdict's evidentiary sufficiency begins with the statutory language.

▮ In relevant part, 21 U.S.C. § 622 provides that:

> Any person, firm, or corporation, or any agent or employee of any person, firm, or corporation, who shall give, pay, or offer, directly or indirectly, to any ... officer or employee of the United States authorized to perform any of the duties prescribed by this subchapter ... any money or other thing of value, with *intent to influence* said ... officer or employee of the United States *in the discharge of any duty provided for in this subchapter*, shall be deemed guilty of a felony....

(Emphases added). Similar to the gratuities prohibition, a violation of this statute requires the presence of three separate elements: the defendant must have (i) directly or indirectly given (or aided and abetted the giving of); (ii) a thing of value to a covered official; (iii) with the intent to influence the discharge of any official duty under the Meat Inspection Act.[13] The Act clearly applies to Tyson Foods, as its Beef and Pork Division accounted for eight to ten percent of its overall business. *See* 6/19/98 Tr. at 910. As with the unlawful gratuities count, the core of the dispute centers around whether the prosecution presented sufficient evidence for a reasonable jury to conclude that Schaffer acted with the requisite intent to influence any of the Secretary's duties under the Meat Inspection Act.

Again, we first address a preliminary issue of statutory construction. With respect to the requisite intent, the language of the Meat Inspection Act differs in material ways from that of the federal gratuity statute. Whereas the Meat Inspection Act expressly requires an "intent to influence the discharge of any duty under the Act," an unlawful gratuity requires that the thing of value be given "for or because of any official act performed or to be performed." While this linguistic distinction might appear minor when viewed in isolation, the place that these two provisions occupy within their respective statutory schemes magnifies the textual difference in important respects. *See Conroy v. Aniskoff*, 507 U.S. 511, 515, 113 S.Ct. 1562, 123 L.Ed.2d 229 (1993) ("the meaning of statutory language, plain or not, depends on context").[14] In its *Sun–Diamond* opinion, the Court emphasized the structure of the gratuity statute, focusing upon the explicit definition given the statutory term "official act" and the consequences that logically followed from that particular wording. The need for an explicit link with a specific act flowed directly from this statutory language, as the gratuity provision's "insistence upon an 'official act,' carefully defined,[15] ... [required] that some particular official act be identified and proved." —— U.S. at ——, 119 S.Ct. at 1407. In the absence of this limiting principle, the Court recognized, the gratuity statute

---

**13.** The terms of the Act apply to all cattle, sheep, swine, goats, horses, mules, and other equines, and to meat products derived therefrom. *See* 21 U.S.C. §§ 603–624.

**14.** Although the Court's *Sun–Diamond* decision speaks only to the federal gratuity statute, the interpretive methods utilized therein, around which we shape our discussion, are nevertheless instructive. In contrast to our dissenting colleague, we believe that the *Sun–Diamond* decision suggests a holistic approach to interpreting statutes that regulate gift-giving, and that it counsels an inquiry that extends beyond merely reading the word "any" to mean "some particular." *See* Dissenting Opinion ("Diss. Op.") at 854.

**15.** *See supra* n. 6.

would unwittingly displace much of the elaborate statutory and administrative regime otherwise regulating the enrichment of public officials. *See id.* at 1410.

By way of comparison, the Meat Inspection Act can be seen as having both a more limited and a more expansive focus. On the one hand, the scope of its gratuity provision is circumscribed by the narrow class of individuals upon which it operates. By definition, the statute covers only two categories of persons: officials with duties under the Meat Inspection Act, and those seeking to influence these officials in the discharge of their duties. In this sense, the Meat Inspection Act exemplifies what the *Sun–Diamond* Court called a "targeted prohibition;" it does not threaten, as did the federal gratuity statute, to make "misfits" out of other pieces of a complex regulatory puzzle.[16] *Id.* Within the narrow range of meat-related activities it covers, however, the Act's gratuity provision is actually more expansive than the general gratuity statute, as it seemingly can be triggered without reference to a particular official act. The Meat Inspection Act lacks a counterpart to the careful definition that the gratuity statute gives the term "official act," the very statutory language upon which the *Sun–Diamond* Court so heavily relied in requiring a particularized nexus. In fact, the Act does not place any restrictive definitional gloss upon what constitutes "the discharge of any duty under the Act," allowing the ordinary meaning of those terms to govern the interpretation. *See United States v. Espy*, 145 F.3d 1369, 1371 (D.C.Cir.1998) (a "duty" is "something that one is expected or required to do by moral or legal obligation") (citation omitted).

As our own *Espy* opinion indicates, the duties of the Agriculture Secretary under the Meat Inspection Act are manifold. *See id.* As part of the Secretary's general obligations to protect the health and welfare of the consuming public from unwholesome or adulterated meat, the Act directs that the Secretary shall "make such rules and regulations as are necessary for the efficient execution" of its provisions, 21 U.S.C. § 621, and shall cause the inspection, in accordance with such rules and regulations, of all meat carcasses capable of use as human food, *see* 21 U.S.C. § 604, the inspection of all meat food products prepared for commerce, *see* 21 U.S.C. § 606, and inspections of all establishments where meat is slaughtered, salted, packed, or rendered. *See* 21 U.S.C. § 608. The Secretary's duty to make all necessary rules and regulations lacks the particularized focus of the term "official act," whether or not the Secretary were to take certain official acts in fulfilling this duty. These duties extend beyond the mere development and promulgation of food safety regulations, and encompass an ongoing obligation to ensure enforcement in conformity therewith. Accordingly, one could unlawfully attempt to influence the Secretary in the discharge of his broad-based duties without identifying any particular policy then at the regulatory fore. The offender might seek to ensure that his company's interests were addressed by whatever decisions or policies ultimately moved up the agency's radar screen, or want simply to affect a pro-enforcement or deregulatory tilt, and a more favorable attitude toward all regulatees. We belabor these obvious points because they illustrate the ways in which the Meat Inspection Act's gratuity prohibition is more expansive, both substantively and temporally, than the general federal gratuity statute under the Supreme Court's *Sun–Diamond* decision. Given the motivating force behind the Meat Inspection Act—*i.e.*, a congressional desire to address the out-

---

**16.** Nothing in the language or structure of the Meat Inspection Act limits its proscription to the giving of bribes, as opposed to gratuities, as our dissenting colleague appears to suggest. *See* Diss. Op. at 855. While we have previously held that bribery requires a defendant to act "corruptly," *see United States v. Gatling*, 96 F.3d 1511, 1522 (D.C.Cir.1996), the Act speaks only of acting with an "intent to influence," the scienter requirement associated with an unlawful gratuity. *See id.*

rageous sanitary conditions documented in Upton Sinclair's book *The Jungle*—the breadth of its gratuity provision is unsurprising. *See Espy*, 145 F.3d at 1371.

■ That said, the fact remains that Schaffer's trial proceeded on the theory that section 622 of the Meat Inspection Act and section 201(c)(1)(A) of the federal gratuity statute were coextensive. *See Williams*, 29 F.Supp.2d at 6. The jury instructions required the same link between the thing given and an intent to influence a particular official action, here either zero tolerance or safe handling labels, as they had for the gratuities counts. Although we are inclined to believe that the Meat Inspection Act contains a less rigorous intent requirement than the federal gratuity statute, we additionally believe that the prosecution presented evidence linking the Russellville party with an intent to influence these specific policies sufficient for a reasonable jury to have found Schaffer guilty beyond a reasonable doubt under the more stringent standard of the gratuity statute. Because our conclusion that the evidence supports a finding of guilt under the gratuity statute's intent requirement necessarily includes a finding that a lesser burden would similarly be satisfied, we leave the precise articulation of the Meat Inspection Act's intent requirement to another day. Accordingly, we will assess the verdict against the standard of the gratuity statute, the very standard advocated and employed by our dissenting colleague. *See* Diss. Op. at 854–55. As with the inaugural dinner, we begin by asking whether a rational trier of fact could conclude that Schaffer either provided or knowingly aided and abetted Tyson Foods in bestowing the Russellville party upon Secretary Espy and Ms. Dempsey. Assuming the evidence supports that finding, we go on to ask whether a rational jury could additionally have determined that the thing of value was provided with the requisite intent to influence Secretary Espy's actions on either zero tolerance or safe handling labels.

On the basis of the evidence presented, a reasonable jury could securely find that Schaffer participated in securing Espy's attendance at the Russellville party. Viewing the trial testimony through prosecutorial lenses, the chronology of events proceeded as follows. In April of 1993 Don Tyson sent Secretary Espy the printed invitation to his weekend gala, along with a hand-written note that informed Espy of both a pending invitation to an Arkansas Poultry Federation ("APF") meeting scheduled to overlap with the party and Tyson's intent to provide transportation to and from Russellville on the company jet. Schaffer received a copy of this writing. *See* GX90. Roughly five days later, the APF President circulated a memorandum to members of the APF Board indicating that Secretary Espy would be in Arkansas on May 15th, clearly implying that Espy already intended to attend the Russellville party before being invited to the APF meeting. That same day, the Senior Vice President of the APF drafted a letter inviting Secretary Espy to speak at the May 15th meeting in Russellville. *See* 6/18/98 Tr. at 486–88; GX91B; GX100. Rather than sending the letter directly to Espy, however, he sent it overnight delivery to Schaffer. Schaffer then arranged for its mailing and faxing to Espy. *See* 6/18/98 Tr. at 535–38, 554; GX91A; GX91B; GX92; GX155; GX156. The APF meeting, at which Secretary Espy ultimately agreed to speak, provided an official reason for Espy to be in Russellville the weekend of the Tyson affair. Given the anomalous course of events, the jury could reasonably infer that the meeting, while legitimate, had nevertheless been set up to provide Espy with official cover.

Schaffer's role in arranging Espy's attendance in Russellville did not end there, as he had a series of communications regarding the trip with Secretary Espy's USDA travel coordinator. In response to her logistical questions involving the Secretary's official itinerary, Schaffer stated that the all-day APF meeting would in-

volve some 150 people (rather than the 15–20 who came), *see* 6/18/98 Tr. at 491, that he would meet Secretary Espy at the airport and escort him to the meeting, that it would be followed by a dinner meeting to which the Secretary was invited, that the Secretary would be overnighting at the Tyson Complex, and that the Secretary would be transported back to Washington on an APF charter plane. Schaffer additionally provided a list of the other passengers on that flight. *See* 6/18/98 Tr. at 558–70. With respect to the transportation arrangements, Schaffer requested use of the Tyson Foods corporate aircraft that transported Dempsey to Russellville for the weekend, and that transported her and Espy back to Washington that Sunday. *See* 6/17/98 Tr. at 318–20; GX103. Despite these extensive efforts, when subsequently questioned by an FBI agent, Schaffer denied knowing who had arranged for the Secretary or his girlfriend to attend the Russellville party or to stay at the Tyson Complex. In addition, he asserted that APF officials, rather than anyone at Tyson Foods, had contacted Espy and arranged his attendance at the APF meeting. *See* 6/22/98 Tr. at 1209–13. On the basis of this testimony, a reasonable jury could find that Schaffer not only helped to arrange Espy's APF speaking engagement, but that he actively participated in securing the attendance of the Secretary and his girlfriend at the Russellville party.

 Turning now to the more difficult question of intent, we note that the independent counsel prosecuted the case under a theory that corresponds to the third variant of our three-part typology of gratuities offenses.[17] *See* discussion *supra* pp. 841–42. In other words, the independent counsel sought to establish that Espy's attendance at the party was secured with the intent to induce the Secretary to propose, take, or shy away from some future act with respect to either zero tolerance or

safe handling labels, or alternatively in the hope that, when those particular issues moved to the regulatory forefront, the Secretary would listen hard to, and hopefully be swayed by, the Tyson Foods' proposals, suggestions, and/or concerns. Again recognizing that proof of an actor's subjective motivation will likely require recourse to circumstantial rather than direct evidence, *see* discussion *supra* pp. 843–44, we believe that the independent counsel has presented sufficient evidence to establish the requisite link.

 The district court rejected the jury verdict on two separate grounds, corresponding to the two identified official acts, each of which we address in turn. First, the court noted that although the Secretary had announced his intent to move forward with the labeling initiative at his February 4th meeting with industry representatives, he did not promulgate the interim regulation until three months after the Russellville party. *See Williams,* 29 F.Supp.2d at 7. Once the proposal had moved to the regulatory forefront in the aftermath of the January 1993 *E coli* outbreak, however, we do not see how the precise timing of its official publication undercuts an inference that Tyson Foods hoped to influence its final form through bestowing largess. The district court's conclusion, echoed by our dissenting colleague, *see* Diss. Op. at 855, presumably picked up on Schaffer's argument that Tyson Foods did not oppose the labeling proposal prior to its August promulgation, and even then only objected to its stringent timing requirements, not to its substance. But again, we do not regard the timing sequence as negating a reasonable inference of intent, particularly under the deferential standard we use in reviewing a jury's verdict of guilt. The statute requires an intent to *influence,* not an attempt to *block* or to *eviscerate* some particular official act. In fact, the economics of

---

17. Since a violation of the Meat Inspection Act, in contrast to the general gratuity statute, additionally requires a link between the favor and a policy that specifically affects meat, the prosecution sought to make this connection as well.

predatory practices instructs that larger companies may support and encourage stringent new regulations, as the marginal cost of complying with a regulation will typically be higher for small companies. *See generally,* Ann P. Bartel & Lacy Glenn Thomas, "Predation through Regulation: The Wage and Profit Effects of the Occupational Safety and Health Administration and the Environmental Protection Agency," 30 J.L. & Econ. 239 (1987). Additional regulation can thus help to undermine competition, and this fact of business life severs any necessary link between opposition and influence. Since the requisite intent under the statute can appear in many forms, we find it irrelevant under the statute whether the party providing the gratuity hoped to induce or to discourage an official act, or even to encourage the recipient to adhere to the status quo.

With respect to zero tolerance, the district court concluded that insofar as that policy related to meat, "[t]he policy had already been implemented, on March 2, 1993, so the [Act's] requisite 'intent to influence' that action could not have been present in May." *Williams,* 29 F.Supp.2d at 7. We do not read the record the same way. While the generative "our tolerance for fecal matter will be zero" memorandum had been issued on March 2nd, the record indicates that FSIS continued to develop and the USDA continued to implement its pathogen control policy throughout 1993. Dr. Cross testified that FSIS worked on a policy of zero tolerance for meat and poultry all during 1993, and that the policy was not ready for presentation to the Secretary until November of that year. *See* 6/17/98 Tr. at 466–67. Moreover, when Dr. Cross left FSIS in 1994, his departure memorandum outlining pending issues listed several elements of the pathogen reduction program for meat that had been originally introduced to the public on February 4th and 5th.[18] *See* GX120; GX116. Finally, whereas the district court emphasized that

zero tolerance applied only to cattle slaughter establishments, which Tyson Foods had never owned, Dr. Cross's congressional testimony illustrates that USDA's pathogen control policy extended to processing plants as well, which Tyson Foods did own. *See* GX116. In any event, regulations governing the meat industry eventually affect all those in the business of selling meat products, regardless of where they fall on the stream of commerce linking the farm to the supermarket shelf. Government initiatives that affect the cost of meat as a raw material logically impact meat resellers like Tyson Foods.

In the absence of any direct statement by Schaffer or Tyson Foods that Espy's attendance at the Russellville party had been substantially motivated by an intent to influence the Secretary, we assess the rationality of the jury's verdict by examining the evidence before it. Our reading of the record reveals that Schaffer and other officials at Tyson Foods had extensive communications with the Secretary and his staff, in each of which they sought to persuade USDA to shift a pending policy in one direction or another. With respect to the safe handling label issue alone, the prosecution introduced a series of written communications seeking to sway the USDA, each of which, in some form, had gone through Schaffer. The jury had before it: (i) a letter from the Foods Regulation Manager and the VP of Operations, Beef and Pork Division at Tyson Foods to Secretary Espy, coupled with testimony that Schaffer reviewed every such document directed at government officials and the public, *see* GX130, 6/23/98 Tr. at 1290; (ii) a letter from Senator Dale Bumpers (essentially drafted by Tyson Foods) to Secretary Espy and to Vice President Gore, copies of which were simultaneously sent to Schaffer, along with testimony regarding contemporaneous communications between Schaffer and Senator Bumpers's

18. Contrary to the dissent's suggestion, *see* Diss. Op. at 855 n.\*, all of the evidence we recount here involves the USDA's policy of zero tolerance for meat. We are not concerned with, and in no way rely upon, the course of the USDA's zero tolerance proposal for poultry.

office about the issue, see GX131, GX131A, 6/19/98 Tr. at 848–52, 6/23/98 Tr. at 1273–75; and (iii) a letter on the labeling issue from Jack Williams to the point-man for the White House with whom the Secretary was in close contact. See GX136, GX138. In addition, the jury heard testimony from George Watts, President of the National Broiler Council, about an August meeting that he, Schaffer, and two others had scheduled with Secretary Espy to discuss the labeling issue. Watts additionally admitted to drafting a pre-meeting memorandum wherein he communicated to the participants the general impropriety of discussions between the Secretary and industry representatives about regulations in the rulemaking stage, and the correlative need to tiptoe around the issue. See 6/18/98 Tr. at 629–39, GX124. Finally, Patricia Dempsey testified that she witnessed John Tyson confront Secretary Espy about the labeling issue at a September 1993 reception, seeking to persuade him of the need to alter the rule. See 6/22/98 Tr. at 1095.

Additional evidence strongly implied that Schaffer had attempted to cover up the involvement of Tyson Foods in Secretary Espy's trip to Russellville. Schaffer took a number of further actions which collectively obscured the fact of Espy's attendance at the party from other USDA officials. For example, when communicating with Espy's travel coordinator, he omitted to mention that the aircraft transporting the Secretary belonged to Tyson Foods, describing it instead as an APF charter. See 6/18/98 Tr. at 573–75. When the USDA sought to reimburse the cost of Espy's transportation and lodging, as required by agency policy, Schaffer directed the APF to create phony invoices and allowed it to receive payment for costs incurred by Tyson Foods. See id. at 495–502. Finally, Schaffer omitted Patricia Dempsey's name from the passenger list of those traveling with the Secretary on the corporate plane from Russellville, thereby obscuring the private nature of the trip from Espy's travel coordinator. See id. at 568, 570.

While admittedly circumstantial, we believe that this confluence of testimony meets the standard of sufficiency. At a minimum, the independent counsel's case: (i) identified specific policies of concern to the defendant and his employer; (ii) that were pending, rather than merely inchoate, at the time of the gratuities; (iii) about which the defendant and/or his employer had timely communications with the recipient public official; (iv) through which it made known its concerns, recommendations, and the likely costs of compliance with the policy in its then current form; (v) and that the official in question was, at the time he received the gratuity, in a position to influence the trajectory of the policies in question. See United States v. Haldeman, 559 F.2d 31, 115–16 (D.C.Cir. 1976) (in banc) (per curiam) ("Except in extraordinary circumstances, criminal intent cannot be proved by direct evidence; it is therefore not only appropriate but also necessary for the jury to look at 'all of the circumstances' in determining specific intent.") (citation omitted). Generally speaking, when a gratuity prosecution has established each of these elements, the jury can rationally decide the intent question either way. While the jury could have accepted Schaffer's defense, finding the gratuities to have been motivated by a desire either to generate warm feelings towards Tyson Foods or to satisfy Don Tyson's penchant for surrounding himself with celebrities, our criminal justice system leaves it to the jury to sort out the competing constructions of the evidence.

### B. Schaffer's Cross–Appeal

Having decided that the district court erred in granting Schaffer's motion for a judgment of acquittal on the Meat Inspection Act count, it becomes necessary to review the court's conditional denial of Schaffer's alternative motion for a new trial. Schaffer seeks a new trial on two separate grounds, claiming that each creates sufficient doubt in the integrity of the jury verdict to constitute reversible error. Because we find each of the alleged

grounds harmless under the prevailing standard for assessing trial errors, we affirm the district court's order and deny Schaffer's cross-appeal.

### 1. The Rule 608(a) Question

 Schaffer challenges a series of rulings by the district court which collectively precluded the defense from introducing testimony regarding the government's grant of immunity to both John and Don Tyson. During cross-examination, government witness John Tyson, who had been identified to the jury as an unindicted co-conspirator and as Schaffer's boss, testified that he and Schaffer had never discussed the possibility of influencing Secretary Espy through largess, nor did he ever think that Espy could be influenced thereby. See 6/19/98 Tr. at 948. Believing that these statements completely exonerated him, Schaffer sought to introduce the fact of the Tysons' immunity to keep the jury from assuming that John Tyson could be prosecuted were he to admit to having discussions about influencing Secretary Espy. Unless cured of this false presumption, Schaffer argued, the jury would likely dismiss John Tyson's testimony on the grounds that he had a strong incentive to prevaricate. The district court excluded this line of questioning, concluding that it would contravene Federal Rules of Evidence 608(a)'s proscription on bolstering a witness whose credibility had not been subjected to attack. In his motion for a new trial, Schaffer challenged the court's construction of Rule 608(a), and alleged that it had improperly and prejudicially kept relevant exculpatory evidence from the jury. While the district court's interpretation and application of Rule 608(a) are not without doubt, we find the weight that Schaffer ascribes to the excluded testimony even more dubious. Assuming arguendo that the court improperly excluded this testimony, we deny Schaffer's cross-appeal because any error was clearly harmless.

Focused upon preventing the introduction of irrelevant, time-consuming testimony, Rule 608(a) provides that:

The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness, and (2) evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise.

FED.R.EVID. 608(a). The rule appears inapplicable, both facially and structurally, to the testimony that Schaffer sought to introduce. Turning to the language of Rule 608(a), the existence of John and Don Tyson's immunity agreements constitutes neither opinion nor reputation evidence, the only two subjects mentioned therein. Moreover, as the rule speaks in general terms of a witness's character for truthfulness, or untruthfulness, it does not touch upon the separate question of whether a generally truthful witness may have a motive to lie in one specific instance. See United States v. Lindemann, 85 F.3d 1232 (7th Cir.1996) (distinguishing five acceptable methods for attacking a witness's credibility, two of which are attacking the witness's character for truthfulness and demonstrating bias); 27 Wright and Gold, Federal Practice and Procedure § 6094 (1990) (same). As the Advisory Committee Notes to Rule 608 explains, while evidence of a witness's general character for honesty or integrity can provide de minimis support for a conclusion as to whether he is testifying accurately on a particular occasion, the probative value of such testimony will generally be outweighed by the needless consumption of time involved in putting "good character" witnesses on the stand. See FED.R.EVID. 608(a) advisory committee's note. Accordingly, the Federal Rules allow the introduction of opinion or reputation testimony to attack a witness's credibility, but limit such good character testimony to situations where the witness's veracity has already been specifically impugned. In contrast to a witness's general character for truthful-

ness or untruthfulness, which is largely peripheral to the facts at issue in a given case, the question of a witness's potential bias is both particularized and case-specific. The presence or absence of bias has relevance because it speaks to whether a witness has an interest in *this* case, or a particular affinity or dislike for *this* party. *See United States v. Abel,* 469 U.S. 45, 51, 105 S.Ct. 465, 83 L.Ed.2d 450 (1984) ("A successful showing of bias on the part of a witness would have a tendency to make the facts to which he testified less probable in the eyes of the jury than it would be without such testimony."); *United States v. Akitoye,* 923 F.2d 221, 225 (1st Cir.1991) (if the cross-examiner may bring out facts tending to show bias, "it follows that the cross-examiner can be allowed some latitude, in an appropriate case, to bring out the absence of bias-producing facts and circumstances, thereby strengthening the credibility of a helpful witness"). In light of its disparate focus, we do not see why Rule 608(a) would apply.

■ Even if Rule 608(a) should not have been used to exclude the fact of John and Don Tyson's immunity, though, any error made by the district court in this case was harmless. When reviewing non-constitutional trial error, we apply the standard articulated in *Kotteakos v. United States,* asking whether we can say "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error...." 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). In so doing, we cannot merely replicate our previous sufficiency-of-the-evidence inquiry; rather, we ask "even so, whether the error itself had substantial influence" on the jury. *Id.*

In this instance, looking at the record as a whole, we think it evident that the district court's evidentiary ruling did not have a substantial influence on the jury verdict. The jury heard John Tyson's testimony, a portion of which allegedly exculpated Schaffer, but apparently did not lend that portion much credence. Had the jurors additionally learned that John Tyson could not be prosecuted for any non-perjurious testimony because of his immunity agreement, it is still difficult to believe that their deliberations would have been affected. John Tyson's credibility had already been called into question repeatedly by contradictory testimony. For example, he denied discussing the safe handling labels issue with Secretary Espy at a September 1993 party, *see* 6/19/98 Tr. at 917, while Patricia Dempsey testified that Tyson had confronted Espy there and requested greater flexibility with the safe handling labels regulation. *See* 6/22/98 Tr. at 1095. Tyson also disputed the proposition that his company had been "concerned" about the labeling issue, *see* 6/19/98 Tr. at 919, despite the extensive Tyson Foods lobbying effort documented in the record. The fact that Tyson lacked a penal motive to cover up the company's or his own attempt to influence Espy would have done little, we think, to alter the jury's assessment of his credibility. Since any admission that Tyson Foods' future president had conspired with others to influence the Secretary of Agriculture would have generated a torrent of negative publicity, which itself would have been highly damaging to the company's (and John Tyson's) business interests, the jury had stronger reasons to be skeptical. Finally, even assuming that an awareness of his immunity agreement would have sufficiently buttressed Tyson's credibility that the jury believed him, his testimony still did no more than establish an expected negative. Given the presumptive expectation that corporate officials would not be so brazen as to discuss some plan or scheme to influence the Secretary openly, but would more likely proceed by winks and nods, the mere absence of any conversations between himself and Schaffer about such a conspiracy casts little if any doubt upon the jury's determination that Schaffer had acted with the requisite intent. All in all, then, we cannot conclude that the jury would have been swayed in a different direction solely by learning that Tyson testified under a grant of immunity.

### 2. The Independent Counsel's Opening and Closing Arguments

▬ Schaffer also challenges a series of statements made by the prosecution during its opening, closing, and rebuttal remarks, each of which allegedly misstated the elements of the crimes charged. On each occasion, Schaffer contends, the prosecution invited the jury to convict him for engaging in lobbying activities alone, without finding the necessary intent to influence specific official acts needed for conviction under the federal gratuity statute and the Meat Inspection Act.[19] Measuring the potential prejudicial effect of these allegedly improper statements with reference to the entire proceeding, as the Supreme Court instructed in *United States v. Young*, 470 U.S. 1, 11–12, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), we cannot say that Schaffer was unfairly prejudiced.

▬ To determine whether improper prosecutorial statements prejudiced a defendant's right to a fair trial, this court generally considers four separate factors. We examine: (i) the severity of the misconduct; (ii) the measures taken to cure the misconduct; (iii) the certainty of conviction absent the improper misconduct, *see United States v. Perholtz*, 842 F.2d 343, 361 (D.C.Cir.1988); and (iv) the centrality of the issue affected by the error. *See United States v. Gartmon*, 146 F.3d 1015, 1026 (D.C.Cir.1998). Reviewing the trial record as a whole, as required by this fact-intensive inquiry, we do not believe that the jury was substantially swayed by the independent counsel's isolated missteps. In their opening and closing re-

marks, both the prosecution and the defense continually stressed to the jury the need to link the things of value with an intent to influence Secretary Espy. *See, e.g.*, 6/26/98 Tr. at 100, 103, 115, 125, 130, 135; 6/25/98 Tr. at 1703, 1717, 1726, 1729, 1737, 1742, 1766. The district court did the same in its instructions to the jury, repeatedly emphasizing that Schaffer could not be found guilty of the offenses charged unless he acted with the requisite intent to influence the Secretary. *See* 6/26/98 Tr. at 1778–80, 1788. From start to finish, this question of intent had center stage at the trial. Because we have no doubt that the jury understood and deliberated on the basis of the proper legal standard, we cannot say that any of the statements in question had any effect on the jury verdict, substantial or otherwise.

### III. CONCLUSION

For the reasons set forth, we affirm the district court's judgment of acquittal in part and reverse in part. Because we additionally reject the challenges raised in Schaffer's conditional cross-appeal, we vacate the judgment of acquittal on the Meat Inspection Act count, reinstate the jury verdict, and remand for sentencing.

*So ordered.*

KAREN LeCRAFT HENDERSON, Circuit Judge, concurring in part and dissenting in part:

I concur in the majority's holding that the gratuity verdict is not supported by the evidence but I disagree with its rever-

---

19. In its opening remarks, the prosecution referenced Tyson Foods' desire to "get cozy" with Secretary Espy four times. While it directly modified this statement on two occasions by stating that gifts "were given in order to get cozy so that they would influence the Secretary of Agriculture in the performance of his duties," 6/16 Tr. at 100, 99, the independent counsel did speak only of "getting cozy" during the other two. In its closing rebuttal statement, the independent counsel also made the following remark:

What the defendants did here, we submit, should not be tolerated. You will decide by your verdict what the standard is. The defendants are guilty beyond a reasonable doubt of the charges contained in the indictment.

The question is, do you want lobbyists for regulated industry to give anything to an official that regulates your food supply when so much is at stake?

*See* 6/25/98 Tr. at 1765–66. Defense counsel immediately objected, and the court sustained the objection and instructed the jury to disregard the statement.

sal of the district court's judgment of acquittal on the Meat Inspection Act count. I believe, like the district court, that the government failed to adduce evidence to support a finding of intent to influence discharge of a specific duty under the Meat Inspection Act, as required by the United States Supreme Court's decision in *United States v. Sun–Diamond Growers of Calif.*, —— U.S. ——, 119 S.Ct. 1402, 143 L.Ed.2d 576 (1999). Therefore, I would uphold the district court's judgment of acquittal on each count of conviction.

Writing on a clean slate, I would propose for both section 22 of the Meat Inspection Act (which criminalizes the giving a thing of value to a government official "with intent to influence said [official] in the discharge of any duty provided for in [the Meat Inspection Act]," 21 U.S.C. § 622) and for the gratuity provision of 18 U.S.C. § 201(c) (which criminalizes giving or receiving a thing of value to or by a public official "for or because of any official act performed or to be performed by such public official," 18 U.S.C. § 201(c)) a much less rigorous showing of intent than the Supreme Court imposed on the gratuity provision in *Sun–Diamond*. Nevertheless, given the Court's strict construction of the gratuity provision there, I do not see how we can interpret section 22 more leniently here.

In *Sun–Diamond*, the Supreme Court concluded the phrase "for or because of any official act" in the gratuity provision "means 'for or because of some particular official act of whatever identity'—just as the question 'Do you like any composer?' normally means 'Do you like some particular composer?'" —— U.S. at ——, 119 S.Ct. at 1407. The Court acknowledged that "[i]t is linguistically possible, of course, for the phrase to mean 'for or because of official acts in general, without specification as to which one'—just as the question 'Do you like any composer?' could mean 'Do you like all composers, no matter what their names or music?'" *Id.* The court stated, however, that "the former seems to us the more natural meaning." *Id.* Applying the same approach to

section 22 of the Meat Inspection Act, I believe the "more natural meaning" of "in the discharge of *any* duty" must be similarly construed to be "in the discharge of some *particular* duty of whatever identity." Although, as the majority observes, the Meat Inspection Act contains no definition of "duty" comparable to section 201's definition of "official act," on which the *Sun–Diamond* Court relied to buttress its interpretation of the gratuity provision, we must still, I believe, adhere to what the Supreme Court has indicated the "natural meaning" of "any duty" is. That this meaning is the required one under *Sun–Diamond* is reinforced by the Court's treatment there of the bribery provision in 18 U.S.C. § 201(b)(1)-(2), which—in language similar to that of section 22 of the Meat Inspection Act—proscribes the giving (§ 201(b)(1)) and receiving (§ 201(b)(2)) of a thing of value "with intent, *inter alia*, 'to influence any official act' (giver) or in return for 'being influenced in the performance of any official act' (recipient)." —— U.S. at ——, 119 S.Ct. at 1406 (quoting 18 U.S.C. § 201(b)(1), (2)).

In *Sun–Diamond*, the Supreme Court compared section 201(b)'s bribery provision with section 201(c)'s gratuity provision and concluded that "[t]he distinguishing feature of each crime is its intent element." —— U.S. at ——, 119 S.Ct. at 1406. The Court noted that for a violation of the bribery provision, "there must be a *quid pro quo*—a specific intent to give or receive something of value *in exchange for* an official act," —— U.S. at ——, 119 S.Ct. at 1406 (emphasis original), while the gratuity provision "requires *only* that the gratuity be given or accepted 'for or because of' an official act." *Id.* (emphasis added). The Court took for granted that the more stringent *quid pro quo* intent requirement for bribery required a connection between the thing given and a specific act or omission by the public official. The only disputed question in the Court's eyes was whether the same connection was required to satisfy the more lenient intent standard

of the gratuity proscription in section 201(c). The Court determined that it was, admonishing that "a statute in this field that can linguistically be interpreted to be either a meat axe or a scalpel should reasonably be taken to be the latter." —— U.S. at ——, 119 S.Ct. at 1410. We must likewise, therefore, treat section 22 as a scalpel which can excise only the most precisely delineated bribes. If the gratuity provision requires proof of a "link" between a bribe and a particular act, as *Sun–Diamond* held, the intent language in section 22 must also be construed to mandate a link between the thing given and discharge of a specific duty the giver has attempted to influence. Applying the *Sun–Diamond* standard, I cannot find evidence to support the required link between the May 1993 feting of Agriculture Secretary Espy in Russellville, Arkansas and an intent on appellee Schaffer's part to influence either the "zero tolerance" policy or the safe handling labeling policy for meat.

First, there is nothing in the record to connect the Russellville festivities to the government's "zero tolerance" policy—except for the bare facts that Tyson Foods was a business that might be affected by such a policy and that the policy (or its revision) may have been actively under consideration by the Department of Agriculture at the time.* This coincidence does not, as *Sun–Diamond* requires, "prove a link" between the policy and the party. *See* Maj. Op. at 844 (concluding that "an awareness by a regulated entity that the USDA had been developing a new pathogen control policy" is not "definitive link" under gratuity provision). There is nothing to suggest that at the time of the Russellville weekend Tyson Foods was concerned about the policy in any specific way, much less that it invited Secretary

Espy with the intent to influence the policy—whether intending to "induce" or "discourage" action on it or to "encourse [him] adhere to the status quo." *See* Maj. Op. at 849. As for the safe handling labeling, the evidence the majority cites to show Tyson Foods was concerned about the policy relates to the August 1993 promulgation of emergency labeling regulations, to take effect 60 days later, and Tyson Foods' opposition to their expedited implementation. *See* Government Exhibits 124, 130, 131, 131A, 136, 138; Trial Tr. at 625–35, 848–52, 1095, 1273–75. There is nothing to suggest that Tyson Foods was aware of the expedition—or that it was even planned—at the time of the Russellville festivities in May 1993.

---

* As the majority notes, a zero tolerance policy for meat had already been adopted in February 1993. *See* Maj. Op. at 837, 844. To the extent the evidence shows an intent to influence a zero tolerance policy for poultry, it cannot support a violation of section 22 of the Meat Inspection Act which criminalizes only gifts to influence the discharge of a duty *under the Meat Inspection Act*. Poultry labeling is not a duty under the Meat Inspection Act, which governs only "meat and meat food products," *see* 21 U.S.C. §§ 602, 603, defined as "any product capable of use as human food which is made wholly or in part from any meat or other portion of the carcass of any cattle, sheep, swine, or goats," *id.* § 601(j) does not govern poultry.